COLUMBIA FIRST BANK,
FSB, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–510 C.

United States Court of Federal Claims.

March 15, 2004.

Mary C. Gill, Atlanta, GA, for plaintiff. William Plybon and Craig H. Kuglar, Atlanta, GA, of counsel.

Brian L. Owsley, with whom were Stuart E. Schiffer, Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Civil Division, United States Department of Justice, Washington, DC, for defendant. Gary J. Dernelle, Richard B. Evans, Colleen Hanrahan, William Kanellis, and Jerome Madden, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

This litigation was scheduled for trial on lost profits damages for plaintiff's claims on November 4–7, 10, and 12–14, 2003. At the close of plaintiff's case in chief on November 7, 2003, defendant made an oral motion for judgment on partial findings pursuant to Rule 52(c) of the Rules of the United States Court of Federal Claims (RCFC). The court ordered briefing on the RCFC 52(c) motion and now has before it Defendant's Motion for Judgment Upon Partial Findings (Def.'s Mot. or defendant's motion) filed on November 21, 2003. Defendant's motion has been fully briefed by the parties.[1] The record before

---

1. In addition to defendant's motion, the court has before it Defendant's Proposed Findings of

the court includes the trial transcript for November 4–7, 2003(Tr.), as well as trial exhibits admitted into evidence (PX for plaintiff's exhibits, DX for defendant's exhibits, and JX for joint exhibits) and Stipulated Findings of Facts (Joint Stip.) filed by the parties on November 3, 2003. Based on the evidentiary record before it, the court GRANTS defendant's motion.

## I. Background

### A. Business Setting [2]

Columbia First Bank, FSB (Columbia), a Washington, DC mutual thrift institution with assets of $1.3 billion, acquired Family Federal Savings and Loan Association (Family), a $56 million stock thrift, on September 27, 1985. Joint Stip. ¶ 1; Pl.'s Facts ¶ 2.[3] This purchase was "an assisted supervisory transaction pursuant to an agreement" (Agreement) between the Federal Savings and Loan Insurance Corporation (FSLIC) and Columbia. Joint Stip. ¶ 1. Some of the key elements of the Agreement for plaintiff were branching rights in Virginia, an Income Capital Certificate (ICC) which eventually

was converted to a Permanent Income Capital Certificate (PICC), and permission to record $20.9 million in supervisory goodwill as regulatory capital.[4] *Columbia First Bank, FSB v. United States,* 54 Fed.Cl. 693, 696 (2002) (*Columbia First*); Joint Stip. ¶ 2.

Columbia converted from a mutual to a stock institution two months after the Family acquisition. Def.'s Facts ¶ 6. Columbia acquired another thrift institution, First Federal of Maryland (First Federal), in March 1987, an acquisition that also allowed plaintiff to record supervisory goodwill on its books. Def.'s Mot. at 15; Def.'s Facts ¶¶ 104–05. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (codified in relevant part at 12 U.S.C. § 1464 (2000)), was enacted in August 1989 and breached certain provisions of the Agreement related to regulatory capital.[5] Plaintiff's damages claims relate to the period of time from just after the implementation of FIRREA in December 1989 until shortly before the acquisition of Columbia by First Union Corporation in November 1995. PX 125 [6] Ch. N; Tr. at 556, 886; Pl.'s Facts ¶¶ 17, 39.

---

Facts (Def.'s Facts), Plaintiff Columbia First Bank, FSB's Opposition to Defendant's Motion for Directed Verdict (Pl.'s Opp.), Plaintiff Columbia First Bank, FSB's Counter–Facts in Connection with its Opposition to Defendant's Motion for Directed Verdict (Pl.'s Facts), Defendant's Reply Brief in Support of its Motion for Judgment Upon Partial Findings (Def.'s Reply), Defendant's Response to Plaintiff Columbia First Bank, FSB's Counter–Facts in Connection with its Opposition to Defendant's Motion for Directed Verdict (Def.'s Reply Facts), Plaintiff Columbia First Bank, FSB's Notice of Supplemental Authority in Support of its Opposition to Defendant's Motion for Directed Verdict (Pl.'s Supp.), and Defendant's Response to Plaintiff's Notice of Supplemental Authority (Def.'s Supp.).

**2.** A description of the financial situation that led to bailouts of savings and loan institutions can be found in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality opinion). A description of the activities that gave rise to the damages claims in this case can be found in the court's prior opinion denying defendant's motion for summary judgment on lost profits damages and granting defendant's motion for summary judgment on the hypothetical cost of replacement capital damages, in *Columbia First Bank, FSB v. United States,* 54 Fed. Cl. 693, 695–96, 704 (2002) (*Columbia First*).

**3.** Unless otherwise indicated by the text or context, facts cited to the filings of only one party do not appear to be contested.

**4.** "Supervisory goodwill is an intangible asset which was, prior to FIRREA, used in calculating a thrift's regulatory capital and satisfying its minimum regulatory capital requirements. Regulatory capital refers to the amount of capital that thrifts were required to maintain. Generally, the required amount of capital was a certain percentage of the thrift's total assets." *Columbia First,* 54 Fed.Cl. at 695 n. 3 (citations omitted).

**5.** Defendant conceded liability on plaintiff's breach claim related to the Family acquisition. Joint Stipulation of April 16, 2002 ¶ a. Plaintiff originally claimed damages for the loss of supervisory goodwill from the First Federal acquisition as well as from the Family acquisition, *see* Complaint (Compl.) ¶¶ 20, 21, 28, but is no longer pursuing damages related to the First Federal acquisition, Plaintiff Columbia First Bank's March 12, 2002 Statement of Issues Before the Court at 7.

**6.** PX 125 is a demonstrative exhibit produced by plaintiff's expert, James R. Causey, and was not admitted as factual evidence. Tr. at 840 (Mr. Causey). It is used here, as it was at trial, as a summation of plaintiff's damages model.

## B. Procedural Setting

In *Columbia First*, 54 Fed.Cl. at 704, the court denied defendant's motion for summary judgment on the issue of lost profits damages related to the breaching provisions of FIR-REA.[7] The court could not, at that stage of the litigation, "find the absence of a genuine issue of material fact," and held that summary judgment on the lost profits issue was not appropriate. *Id.* at 702. Among other proffers of evidence, the court cited plaintiff's statements regarding potential acquisitions of other financial institutions as evidence that created a genuine issue of material fact regarding Columbia's lost profits. *Id.* at 701–02. According to plaintiff's brief filed on September 3, 2002, "Columbia First identified a host of potential acquisitions Columbia First had to forego in the wake of FIRREA." *See* Plaintiff Columbia First Bank's Opposition to Defendant's Motion for Summary Judgment Upon Plaintiff's Damages Claims at 20 (listing nine banks that were "potential acquisitions"). The only claim now before the court is for alleged lost profits damages resulting from the change effected by FIR-REA in the regulatory treatment of the then remaining supervisory goodwill from the Family transaction.[8] *See* Pl.'s Opp. at 2 (stating that "the amount of lost profits resulting from the exclusion of the supervisory goodwill ... totaled $6.8 million," which is the relief sought in this case). Of the original $20.9 million in Family-related supervisory goodwill, $14.5 million remained at the time of the breach. Def.'s Mot. at 1; Pl.'s Facts ¶ 17.

At trial, plaintiff put on its lost profits case based on the testimony of three former officers of plaintiff and a model provided in the expert testimony of Mr. James R. Causey. Pl.'s Opp. at 23, 28–29. Mr. Causey's model calculated that $6.8 million in damages was caused by the breaching provisions of FIR-REA. *Id.* at 29. The damages model Mr.

Causey created divides the relevant quarters in the thrift's post-breach history into two periods, January 1990 through June 1991 and July 1991 through September 1995. *See id.;* PX 125 Ch. C. Adapting terms employed by Mr. Causey, the court will refer to these periods as the Shrink Period and the Growth Period, respectively. *See* PX 125 at 8, Chs. C, D, H.

Surprisingly, given the facts put forward by plaintiff in its defense against defendant's motion for summary judgment on lost profits damages, *Columbia First*, 54 Fed.Cl. at 702, the lost profits model presented at trial does not rely on the acquisition of other financial institutions. Pl.'s Facts ¶ 39; Tr. at 884–86 (Mr. Causey). Instead, Mr. Causey posits that, during the Shrink Period, the "but-for-the-breach" Columbia (the but–for bank) would have grown at a 4% annual growth rate with a net addition to its assets of some mixture of mortgage-backed securities and/or residential mortgages. Pl.'s Facts ¶¶ 34–35. Plaintiff refers to these hypothetical net additional assets as the "incremental assets." *Id.* ¶ 35. During both the Shrink Period and the Growth Period, Mr. Causey opines, the now larger but-for bank would have had a Return on Average Assets (ROAA) of 50 basis points[9] on the incremental assets. PX 125 Chs. K, N. Mr. Causey arrives at $6.8 million in lost profits damages by adding up the returns per quarter on the incremental assets over the post-breach damages period, that is, the twenty-three quarters from January 1990 through September 1995. *Id.* Ch. N.

In addition to the testimony of Mr. Causey, plaintiff presented the testimony of three fact witnesses at trial. Mr. Dewitt T. Hartwell, Sr. was president of Columbia at the time of the Family acquisition in 1985, Tr. at 38, 41–42 (Mr. Hartwell), remained president of Columbia until approximately January 1989, Tr. at 255 (Mr. Schaefer), and

---

7. However, the court granted defendant's motion for summary judgment on the issue of damages based on the hypothetical cost of replacement capital for the excluded supervisory goodwill that Columbia had previously been able to include as part of its regulatory capital. *Columbia First*, 54 Fed.Cl. at 697–700.

8. Plaintiff has abandoned claims arising from the impact of FIRREA on the PICC. Plaintiff Columbia First Bank's Post Conference Brief at 1–2.

9. A ROAA of 50 basis points describes an annual return of .5 percent on a portfolio of assets. *See* PX 125 at 12; Tr. at 918–19 (Mr. Causey).

was a member of Columbia's Board of Directors from about 1984 to 1995, Tr. at 42, 135 (Mr. Hartwell). Mr. Thomas J. Schaefer was president and CEO of Columbia from about January 1989 until November 1995. Tr. at 254–55 (Mr. Schaefer). Mr. Robert J. Creighton joined Columbia in November 1990, initially as a senior officer in the finance division. Tr. at 545, 553–54 (Mr. Creighton). He became CFO sometime in 1991. Tr. at 554 (Mr. Creighton). During the week of trial devoted to plaintiff's case in chief, more than eighty documents were admitted into evidence through the testimony of these witnesses.

## II. Discussion

### A. Judgment on Partial Findings under RCFC 52(c)

■ At the close of plaintiff's case, defendant moved for judgment on partial findings under RCFC 52(c). RCFC 52(c) provides that:

> If during a trial a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

RCFC 52(c). "In this court, the judge, rather than a jury, is always the trier of fact." *Persyn v. United States*, 34 Fed.Cl. 187, 194 (1995). Therefore, in responding to a RCFC 52(c) motion, this court may weigh the evidence and is not required to resolve all credibility issues and make all reasonable inferences in favor of plaintiff, as is required by a motion for a directed verdict under Fed. R.Civ.P. 50(a). *Id.* at 194–95. The trial may end at the close of a plaintiff's case if a plaintiff has failed to maintain its claim, RCFC 52(c), because "[a] plaintiff has no automatic right to cross-examine a defendant's witnesses for the purpose of proving what the plaintiff failed to establish during the presentation of its case," *Cooper v. United States*, 37 Fed.Cl. 28, 35 (1996).

### B. Proof of Lost Profits Damages in a *Winstar*-related Case

The Federal Circuit has provided the "controlling law," RCFC 52(c), which defines the elements required for a *Winstar*-related plaintiff to prove expectancy damages, *see* *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001) (*Bluebonnet*) (applying Restatement (Second) of Contracts §§ 347, 351, 352 (1981) to expectancy damages claims deriving from a FIRREA-related breach). "Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Id.* Lost profits are one type of expectancy damages. *See Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001) (*Glendale*) (stating that "[t]he benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well").

This court, in another *Winstar*-related case, recently restated these three lost profits damages elements, in a formulation that is useful for analyzing the evidence presented by plaintiff in this case:

> Lost profits may be recovered where plaintiff establishes by a preponderance of the evidence that (1) the loss was the proximate result of the breach; (2) the lost profits were foreseeable; and (3) a sufficient basis exists for estimating those lost profits with reasonable certainty.

*Commercial Fed. Bank, FSB v. United States*, 59 Fed.Cl. 338, 344 (2004) (*Com Fed*) (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324–25 (Fed.Cir.2002) (*Energy Capital*) and *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349–50 (Fed. Cir.2001) (*Cal Fed I*)). *See also Globe Sav. Bank, FSB v. United States*, 59 Fed.Cl. 86, 92 (2003) (*Globe*) (almost identical phrasing of the three elements for proof of lost profits damages).

Defendant asserts that there is a fourth element of lost profits damages that plaintiff must prove in order to prevail over defendant's motion, related to the "principle[ ] of

... avoidability (mitigation)." Def.'s Mot. at 6–7. There is controlling authority that lost profits damages in a *Winstar*-related case may be limited by mitigating actions taken by a plaintiff after the breach caused by FIRREA. *See LaSalle Talman Bank, FSB v. United States,* 317 F.3d 1363, 1373 (Fed. Cir.2003) (*LaSalle II*) ("We affirm the principle that [plaintiff's] profits ... should be recognized as reducing the damages attributable to the breach [caused by FIRREA]. However, this recognition is limited to profits directly due to the actions in mitigation ...."). This court declines to consider defendant's mitigation argument, however, because defendant's motion can be appropriately decided on the three lost profits damages elements of proof cited above: causation, foreseeability, and reasonable certainty of amount. *See Energy Capital,* 302 F.3d at 1326 ("[Plaintiff] was required to demonstrate its entitlement to lost profits by showing the same elements that any business must show: (1) causation, (2) foreseeability, and (3) reasonable certainty.").

### 1. Causation

As a threshold matter, defendant cites to *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1022–23 (Fed.Cir.1996) (*Wells Fargo*), a non-*Winstar*-related case, for the proposition that lost profits damages in this court "must be certain and not speculative." Def.'s Mot. at 7. Defendant warns that lost profits damages are not recoverable if they are " 'remote and consequential,' " *id.* at 1021 (citations omitted), or derived from " 'independent and collateral undertakings,' " *id.* at 1023 (citations omitted). The issue of whether investment profits, foregone as a result of the loss of regulatory capital, are, if proven, sufficiently related to the breaching provisions of FIRREA to be recoverable in *Winstar*-related cases has been adequately resolved in plaintiff's favor. *See Cal Fed I,* 245 F.3d at 1349 ("Profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages."). *See also Com Fed,* 59 Fed.Cl. at 345 ("While *Wells Fargo* provides the principle by which causation for lost profits is judged, *Cal. Fed. (Cal Fed I)* is an important guide to its application in the *Winstar* context."). In the *Winstar* context, the loss of supervisory goodwill can cause a reduction in investments and related profits, and lost profits damages have been awarded as a result. *See Com Fed,* 59 Fed.Cl. at 350 ("On the basis of the evidence adduced at trial ... the breaching provision of FIRREA resulted in lost profits of $5,602,000."). But, as the Federal Circuit stated in *Glendale,* "[t]he problems of proof attendant on the burden placed on the non-breaching party of establishing lost profits-on establishing what might have been-are well recognized." 239 F.3d at 1380.

#### a. The "Loss"

■ In its review of the causation element of lost profits ("the loss was the proximate result of the breach"), *Com Fed,* 59 Fed.Cl. at 344, the court must apply the legal concept of "proximate cause" to the causal connection between the contract breach and the alleged damages. The discussion of the subject in a treatise is helpful here:

*"Proximate Cause" and Cause in Fact*

Sometimes the rule is expressed by saying the plaintiff must prove that breach was a proximate cause of damages.... [Discussed here] is the rule that the damages claimed must in *fact* result from the breach.

*Application of Cause in Fact Requirement*

■ The causation in fact requirement prevents the plaintiff's recovery for any losses not proven to have occurred at all ....

3 Dan B. Dobbs, *Dobbs Law of Remedies* § 12.4(2), at 66 (2d ed.1993). In the *Winstar*-related context, causation in fact of lost profits can be shown by proving that profitable investments would have been made by leveraging the additional capital that would have been available to plaintiff absent the breach. *See Cal Fed I,* 245 F.3d at 1349 ("Lost profits are 'a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established ....' " (quoting *Neely v. United*

*States*, 152 Ct.Cl. 137, 146, 285 F.2d 438 (1961))); *Com Fed*, 59 Fed. Cl. at 344 ("Plaintiff's fundamental claim with respect to lost profits is that defendant breached its promise to permit the use of supervisory goodwill in its calculation of regulatory capital, and that such breach caused them to for[e]go investment opportunities to leverage that capital. Had the bank held more assets, it is alleged that more profits would have been earned.").

In order to recover, plaintiff must prove both that it would have made additional investments, and that those additional investments would have been profitable during the relevant period of time in the but-for world.

### b. "Substantial Factor" Analysis of Causation

■ Another component of the legal concept of "proximate cause" is the nature of the causal link between the contract breach and alleged losses. *See* Dobbs, *supra* ("The causation in fact requirement prevents the plaintiff's recovery ... for losses which in fact occurred but as a result of factors wholly other than the defendant's breach ...."). Defendant argues that a "but-for" analysis of the causal link is the appropriate standard of review for lost profits damages in this court. Def.'s Mot. at 12. Plaintiff suggests that a "substantial factor" causation analysis is the correct standard of review. Pl.'s Opp. at 25. While the point is not free from doubt, the court concludes that the weight of authority supports the appropriateness of the use of the substantial factor analysis of causation for lost profits damages in this court. *See, e.g., Bluebonnet*, 266 F.3d at 1356 ("The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs ...."); *Westfed Holdings, Inc. v. United States*, 55 Fed.Cl. 544, 553 (2003) (*Westfed*) (listing cases using the substantial factor test for causation of lost profits damages), *appeals docketed*, Nos. 03–5131, 03–5145 (Fed.Cir. July 16, 2003, Aug. 14, 2003); *Energy Capital Corp. v.*

*United States*, 47 Fed.Cl. 382, 395 (2000) ("[T]he Court will require the Plaintiff to prove that the breach was a 'substantial factor' in causing its losses, the test in the majority of jurisdictions."), *aff'd in part, rev'd in part and remanded on other grounds*, 302 F.3d 1314 (Fed.Cir.2002). *But see Cal. Fed. Bank v. United States*, 54 Fed. Cl. 704, 712 n. 18 (2002) (*Cal Fed II*) ("If the standard has changed [from a more strict causation standard to the substantial factor standard], the result in this case nevertheless remains the same."), *appeals docketed*, Nos. 03–5070, 03–5082 (Fed. Cir. Mar. 28, 2003, April 16, 2003).[10] For the foregoing reasons, the court reviews the causation element of lost profits damages using the substantial factor standard urged by plaintiff.

The precise formulation of the "substantial factor" causation standard is not well-settled in *Winstar*-related cases; this court has relied on a variety of formulations employing common-sense usages of the words as a touchstone. *See, e.g., S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 57 Fed.Cl. 598, 618–19 (2003) ("While the Court appreciates and understands [plaintiff's] continued need to expand its capital position, we do not find that the breach was *the* substantial factor in causing either the 1997 or the 1998 transactions." (emphasis added)); *Coast Fed. Bank, FSB v. United States*, 48 Fed.Cl. 402, 426 (2000), *aff'd on other grounds*, 323 F.3d 1035 (Fed.Cir.2003) ("Whether the breach did in fact cause plaintiff's damages-that is, whether it was a *sufficiently* 'substantial factor' in the claimed damages to be considered *the cause* of those damages is a separate question ...." (citation omitted) (emphasis added)); *Suess v. United States*, 52 Fed.Cl. 221, 231 (2002) ("The court thus holds that the breaching provisions of FIRREA were *the* 'substantial factor' leading to the demise of Franklin, and *sufficient to establish the causation element of damages* based on the lost value of the Franklin franchise." (emphasis added)); *Westfed Holdings, Inc. v. United States*, 52 Fed.Cl. 135, 160 (2002) ("Whether [plaintiff's] undercapitalization was *primarily* the result of the breach, *or whether other*

---

**10.** The court also has used the substantial factor standard for analyzing causation in the context of damages related to the replacement cost of

capital. *See Citizens Fed. Bank, FSB v. United States*, 2004 U.S. Claims LEXIS 35, at *21–27.

*factors were sufficiently important that the breach was not a 'substantial factor'* is a determination that cannot be made on the record before the court in the context of summary judgment." (emphasis added)).

Appellate guidance on the use of the substantial factor standard of causation in contract cases is sparse. *See Bluebonnet,* 266 F.3d at 1356 ("The Court of Federal Claims properly determined that the breach of the forbearances was *a* substantial factor in [plaintiff's] increased financing costs because it *forced* Bluebonnet to raise capital at a time when FIRREA had made investments in thrifts riskier and considerably less attractive." (emphasis added)). Indeed, the parties have not pointed to, nor has the court found, any Federal Circuit or Supreme Court decision which more particularly defines or analyzes substantial factor causation in the contract damages context.[11]

There are few federal cases containing any substantive discussion of the substantial factor test for causation in contract cases.[12] In *Krauss v. Greenbarg,* the Third Circuit explained the meaning of substantial factor causation in the context of a contracts case:

One of the legal tests which must be met in order for something which is a cause in fact to be a "legal cause" is that it shall have been a substantial factor in bringing about the harm. As thus used substantial denotes "the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, ...." If a number of factors are operating one may so predominate in bringing about the harm as to make the effect produced by others so negligible that they cannot be considered substantial factors and hence legal causes of the harm produced. In that event liability attaches, the requisites of legal cause being shown, only to the one responsible for the predom-

inating, or substantial, factor bringing the harm.

137 F.2d 569, 572 (3d Cir.1943) (citations omitted). That court went on to say that a jury charge on causation stating "that although there may have been other contributing causes, if the 'primary' 'real' 'main' 'chief' cause of the [damaged party's incapacity to perform on another contract] was the [breaching party's delay], then the loss was chargeable to [the breaching party]. That [breaching party's] delay, [the judge] charged [the jury], had 'to be sufficient in itself to have delayed [the damaged party's performance on the other contract] ....'" *Id.* In the *Krauss* court's view, "substantial factor" causation was roughly synonymous with predominating, primary, real, main or chief causal factor. *See id.* (stating that the jury charge "required no less than" the *Krauss* court's definition that used the words predominating and substantial as synonyms). Although *Krauss* was decided under Pennsylvania law, the *Krauss* court's explanation of substantial factor causation appears to be in general accord with this court's application of the substantial factor causation analysis of damages in the *Winstar* context.

Another substantive explanation of substantial factor causation in the contract breach context was offered in *Point Prods., A.G. v. Sony Music Entm't, Inc.,* 215 F.Supp.2d 336 (S.D.N.Y.2002) (*Point Productions*). After plaintiff suggested the "substantial factor" standard, and defendant countered with the "but for" standard, the court cautioned that "plaintiff fails to acknowledge the level of causal relationship the substantial factor test actually requires." *Id.* at 341–42. After discussing relevant New York caselaw, the court noted that "[t]here is, therefore, little distinction in practice between the substantial factor and but for causation tests." *Id.* at 344. The court described substantial factor causation as requiring a "strong causal relationship."

---

**11.** Defendant cites to *Abbott Labs. v. Brennan,* 952 F.2d 1346, 1353 (Fed.Cir.1991), but that case discusses substantial factor causation in the tort context, and under Michigan state law. Def.'s Mot. at 13.

**12.** Even the decisions discussed in text are decided under state law in federal diversity jurisdic-

tion. Federal court decisions in other circuits may provide persuasive authority. *See Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.,* 892 F.2d 1021, 1026 n. 5 (Fed.Cir.1989) (stating that "substantive case law from the other federal circuits, however, provides only persuasive authority from which we may seek guidance").

*Id.* at 343. If multiple causes are present, "plaintiff must still prove that a defendant's breach of contract was sufficiently connected to plaintiff's damage that it could reasonably be said to have caused the injury, that is, that defendant was the cause in fact of plaintiff's damages." *Id.* at 344. The court defined the proof of causation under the substantial factor standard in that case as follows: "[t]he burden on [plaintiff] is to prove that [defendant's] actions forced [plaintiff] to file for bankruptcy protection [, in order to justify its claim for post-bankruptcy damages]." *Id.* The *Point Productions* court defined the substantial factor causation test as one that requires a "direct causal relationship," where a contract breach forces damages upon a plaintiff. *Id.* Although the *Point Productions* court was interpreting New York law, its elaboration of the substantial factor causation test also appears to be in general accord with this court's analysis of substantial factor causation of damages in the *Winstar*-context.

■ Plaintiff must prove that the changes in the accounting of supervisory goodwill from the Family transaction that were imposed by the breaching provisions of FIRREA were a substantial factor causing the alleged loss, that is, that the breaching provisions directly and primarily caused the lost profits damages it seeks.

2. Foreseeability

Defendant asserts that, under *Wells Fargo,* "[t]he Federal Circuit ... has already ruled that, as a matter of law, hypothetical leverage-based profits are not foreseeable when a financial institution is deprived of the right to operate in a more highly leveraged manner, i.e., with more regulatory capital." Def.'s Mot. at 35 (citing *Wells Fargo,* 88 F.3d at 1023–24). Defendant's assertion proves too much-if that statement were true, lost profits would never be available in the *Winstar* context for losses related to diminished regulatory capital. The Federal Circuit and this court have not applied such a strict interpretation of foreseeability to *Winstar*-related cases. *See, e.g., Cal Fed I,* 245 F.3d at 1349 ("The continued use of supervisory goodwill as regulatory capital for the entire

35–40 year amortization period initially promised was therefore a central focus of the contract and the subject of the government's breach. Profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages."); *Anchor Savings Bank, FSB v. United States,* 59 Fed.Cl. 126, 146 (2003) (*Anchor*) ("[T]he question here is whether a reasonable person simply could have foreseen the type of use [plaintiff] made of its supervisory goodwill. Or, more specifically, could a reasonable person have foreseen that [plaintiff] would use its supervisory goodwill to free-up other tangible capital for [a particular investment]."); *LaSalle Talman Bank, F.S.B. v. United States,* 45 Fed.Cl. 64, 89 (1999) (*LaSalle I*) (stating that, as to a claim of breach by curtailment of supervisory good will, "[t]he court also holds that the general type of lost profits claimed-income lost due either to shrinkage of the bank's deposit and loan bases, to lowered returns on ongoing aspects of its business, or to having to abandon profitable lines of business-should all have been within the contemplation of the parties"), *rev'd on other grounds,* 317 F.3d 1363 (Fed.Cir.2003). *Cf. Cal Fed II,* 54 Fed. Cl. at 714 (denying foreseeability of alleged lost profits after trial even though the court "agree[d] with plaintiff's statement, that '[plaintiff] has demonstrated ... [that the Government] foresaw, or should have foreseen, that a breach of its goodwill promises could cause [plaintiff] to shrink,'" because the government could not have foreseen that shrinking the bank would have resulted in lost profits).

*Chain Belt Co. v. United States,* 127 Ct.Cl. 38, 115 F.Supp. 701 (1953) (*Chain Belt*) provides the standard for foreseeability of lost profits in this court:

Whether or not loss of profits on breach was within the contemplation of the parties at the time the contract was made, depends on the facts of each case. The Restatement of the Law, Contracts, states the following on the matter of foreseeability of harm as a requisite for recovery:

§ 330. * * *

In awarding damages, compensation is given for only those injuries that the

defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown that the defendant had reason to know the facts and to foresee the injury.

*Id.* at 59, 115 F.Supp. 701. *See also Energy Capital,* 302 F.3d at 1325 (citing to *Chain Belt*). This foreseeability standard has been applied in the *Winstar* context, and requires a factual inquiry into the type of investments that plaintiff has alleged as a basis for a lost profits claim. *See, e.g., Landmark Land Co. v. United States,* 256 F.3d 1365, 1379 (Fed. Cir.2001) ("Foreseeability is a question of fact." (citation omitted)); *Anchor,* 59 Fed.Cl. at 146 (stating that for proof of lost profits, the damages alleged "must only 'reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach'" (citation omitted)); *Globe,* 59 Fed. Cl. at 94, 96, (examining deposition testimony on the "types and categories of investments [plaintiff] would have pursued absent the breach" and finding a question of material fact on the issue of reasonable foreseeability, among others).

■ Plaintiff must establish facts sufficient to show that its hypothetical investments were "in the usual course of events" and thus were reasonably foreseeable by defendant. *See Chain Belt,* 127 Ct.Cl. at 59, 115 F.Supp. 701.

### 3. Reasonably Certain Estimate of Damages Using a Damages Model

In presenting factual evidence and expert testimony interpreting that evidence, plaintiff must present a damages model that offers "a sufficient basis ... for estimating those lost profits with reasonable certainty." *Com Fed,* 59 Fed.Cl. at 344. The purpose of a damages model supported by facts in evidence is to "quantify the measure of damages to a reasonable certainty." *See Bluebonnet,* 266 F.3d at 1357 (reversing lower court when a document in evidence was "regularly prepared in the normal course of business" and

reflected "increased financing costs [due to the government's breach];" stating that the document was "improperly rejected ... as support for the [alleged] damages;" and stating that plaintiff's case "me[t] the reasonable certainty test").

The parties offer different glosses on the "reasonable certainty" standard. *Compare* Def.'s Reply at 10 ("Damages may not be determined by 'mere speculation or guess;' evidence showing the extent of the damages as a matter of 'just and reasonable inference' is required.") (citing *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931)), *with* Pl.'s Opp. at 28 ("'The reasonable certainty test for lost profits in this circuit is that "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery," and the court's duty is to "make a fair and reasonable approximation of the damages."'" (quoting *Westfed,* 55 Fed.Cl. at 559)).

The court agrees with defendant that mere speculation and guess-work are not enough to prove "reasonable certainty" of lost profits damages. "Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." *Restatement (Second) of Contracts* § 352 (1981). But plaintiff is correct that "plaintiff's burden is to reasonably *estimate* the damages it suffered." Pl.'s Opp. at 18. The proof of lost profits damages does not require "exact science," "absolute exactness," or "mathematical precision" if "'"the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation."'" *Bluebonnet,* 266 F.3d at 1355 (citations omitted).

Plaintiff relies particularly on *LaSalle II,* Pl.'s Opp. at 17–18, for a formulation of the burden of proof on amount of damages: "[W]hen damages are hard to estimate, the burden of imprecision does not fall on the innocent party. 'If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'" 317 F.3d at 1374 (citations omitted). The court believes that plaintiff's reliance is misplaced. The discussion by the Federal Circuit on which plaintiff relies was

in the context of separating the profits associated with transactions in mitigation from breach-related lost profits. *See id.* In that litigation, the breach-related damages had already been established at trial with reasonable certainty, with specific dollar figures attached to individual components of lost profits. *See LaSalle I,* 45 Fed.Cl. at 95 ("Plaintiff has therefore shown that it lost profits on its mortgage servicing business for the period from January 1990 to November 1991. This amounts to $1.9 million."). The court believes that the burden of establishing damages with reasonable certainty in the first instance is distinguishable from and different than the burden of separating out mitigation-related profits from lost profits, the existence of which has already been proven to a reasonable certainty. *Cf. LaSalle II,* 317 F.3d at 1374 (remanding for recalculation of mitigation-related profits, but not for recalculation of lost profits, because "the burden of imprecision does not fall on the innocent party").

Precedential authority as to the amount of uncertainty or imprecision that is acceptable under the "reasonable certainty" standard for estimating damages is not extensive. *See, e.g., Chain Belt,* 127 Ct.Cl. at 59, 115 F.Supp. 701 ("The more recent [circa 1953] and general view of the courts seems to be that if the fact of damage, that is, lost profits, is certain, uncertainty as to the precise amount lost is not necessarily fatal to recovery." (citation omitted)). The court, instead of testing a damages model for a particular level of a precision, tests the model for its " ' "sufficien[cy] to enable a court or jury to make a fair and reasonable approximation." ' " *Bluebonnet,* 266 F.3d at 1355 (citations omitted). For additional articulations of the standard, the court looks to recent *Winstar*-related cases.

The sufficiency of damages models under the reasonable certainty standard has been repeatedly examined in recent *Winstar*-related cases in this court. In *Fifth Third Bank of Western Ohio v. United States,* 55 Fed.Cl. 223 (2003) (*Fifth Third*), the court rejected a lost profits model which "fail[ed] to account for any real-world events other than the profitability of [the predecessor bank]," *id.* at

241, and "assume[d] that [the predecessor bank] would have grown and profited with the adjusted asset base fully lever[ag]ed by the restoration of goodwill in the same manner as [the predecessor bank] grew in the real world with its reduced asset base," *id.* at 240. In *Southern National Corp. v. United States,* 57 Fed.Cl. 294, 305 (2003) (*Southern National*), the court rejected a lost profits model which "did not factor [in] the element of competition" and in which "the return on the [incremental] assets acquired would parallel the thrift's past earnings." Both *Fifth Third,* 55 Fed.Cl. at 242, and *Southern National,* 57 Fed.Cl at 306, were decided on defendant's motion for summary judgment.

■ This court has also applied the reasonable certainty standard to *Winstar*-related lost profits damages models after testing the models at trial. In *Cal Fed II,* the court rejected a lost profits model as being "purely speculative." 54 Fed.Cl. at 715. In that case, the court found many problems with the damages model: it relied on " 'other foregone assets' that are not defined," to which are applied "a one percent return on investment, which cannot be documented;" it structured the hypothetical funding of the foregone assets to "inflate[ ] profits;" and it employed assumptions about hypothetical interest rate spreads that were not based in reality. *Id.* at 708. In *Com Fed,* the court approved a lost profits damages model under the reasonable certainty standard, based on a wealth of clear evidence, projections reliably anchored in the bank's actual investment and profitability history, and the credibility of witnesses and plaintiff's expert:

The court has conducted a trial for more than a month, reviewed pre-breach business plans, thousands of pages of testimony and expert reports, economic data relating to thrifts, and particularly the Kansas market in which plaintiff operated, and listened to testimony of participants involved in the negotiation, implementation, and regulation of the terms of the Agreement [breached by FIRREA]. There is no doubt that plaintiff is entitled to $5,602,000.

59 Fed.Cl. at 351. In this case, therefore, to meet the reasonable certainty standard plain-

tiff's damages model must similarly be based on sufficient factual evidence, must use assumptions and calculations that are moored in that factual evidence, and must be credible, *see id.* at 350 ("[T]he court finds credible [the expert's] one percent ROA assumption, leading to a $5,602,000 damages claim during this period."); *Cal Fed I,* 245 F.3d at 1350 (approving lower court's weighing of credibility in the determination of damages). Plaintiff's model must be reasonably certain in order to provide this court with the justification for an award that is "a fair and reasonable approximation" of plaintiff's lost profits damages. *See Bluebonnet,* 266 F.3d at 1355.

A particular concern with the damages model is this case is whether the facts in evidence support the assumptions and calculations Mr. Causey has used to arrive at $6.8 million in damages. There are three underlying assumptions in plaintiff's damages model for foregone investment income during the Shrink Period and the Growth Period:

> the thrift: (1) would have lever[ag]ed its additional capital in the manner Mr. Causey describes; (2) could have located, bid upon, and acquired $266 million [ ] of additional assets; and (3) could have profitably funded those additional assets with $266 million of additional liabilities.

Def.'s Mot. at 23.[13] In addition to these underlying assumptions, Mr. Causey's model depends upon two calculations of particular significance: first, during the Shrink Period, Mr. Causey applies an assets growth rate of 4% per annum, *id.* at 26, and second, during both the Shrink Period and the Growth Period, Mr. Causey applies an average ROAA of 50 basis points to the incremental assets of the but-for Columbia, *id.* at 28–29. As discussed below,[14] these assumptions and calculations are almost totally unmoored from the factual evidence presented by plaintiff.

#### 4. Jury Verdict When No Other Reliable Method Exists

If plaintiff's damages model does not provide a "sufficient basis" for estimating dam-

ages, *Com Fed,* 59 Fed.Cl. at 344, plaintiff can attempt to justify its damages by meeting the standard for a jury verdict method award. *See Bluebonnet,* 266 F.3d at 1357 (stating that the Federal Circuit has "allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages-but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation" (citations omitted)). Plaintiff argues for a jury verdict method award here if its damages model "fails to meet the 'reasonable certainty' test [because] it is nonetheless adequate evidence with which this Court may make a fair and reasonable approximation of damages." Pl.'s Opp. at 37.

The Federal Circuit has explained how and when this court may use the so-called "jury verdict" method for approximating damages. In *Dawco Construction, Inc. v. United States,* 930 F.2d 872, 880 (Fed.Cir.1991) (*Dawco*), *overruled on other grounds by Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed. Cir.1995), the Federal Circuit reversed, in relevant part, a damages award based on the jury verdict method "resorted to" by this court:

> Before adopting the "jury verdict method," the court must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of damages.

*Id.* at 880. Although the first and third requirements do not appear to require further explanation, the second requirement can be better understood through its application in *Dawco.* There, plaintiff failed to provide documentation of "its other costs, including additional overhead" to substantiate its equitable adjustment damages on a government contract. *Id.* at 881–82. The court warned against "the risk that unrealistic assumptions

---

**13.** The size of the hypothetical incremental assets portfolio was referred to by the parties as $266 or $267 million during trial. Plaintiff's summary exhibit of its damages model uses $266,526,000 for the incremental assets portfolio. PX 125 Ch.

N. The court considers all of these references to be to the same number.

**14.** *See infra* Part II.C.

will be adopted and extrapolated, greatly multiplying an award beyond reason, and rewarding preparers of imprecise claims based on undocumented costs with unjustified windfalls." *Id.*

 Although the *Winstar* context and lost profits damages differ from equitable adjustments to federal contracts, a plaintiff in either context is in the best position to document its losses and bears the burden of proving that "no more reliable method for computing damages" exists. *See id.* at 881 ("'[I]t is equally well-settled that the amount of the recovery can only be approximated in the format of a "jury verdict" where the claimant can demonstrate a *justifiable inability to substantiate* the amount of his resultant injury by direct and specific proof.'" (citation omitted)). The *Dawco* court found that:

> [Plaintiff] was in an ideal position to detail all its costs. Or, at least, it could have, and should have, been.... [T]he prudent contractor ... must maintain records detailing any *additional* work ....

*Id.* at 881. The court notes that, in this case, plaintiff lost evidence related to its claims for lost profits damages. *Columbia First Bank, FSB v. United States,* 58 Fed.Cl. 54, 56 (2003) (deciding defendant's motion in limine requesting the court to draw adverse inferences from plaintiff's alleged spoliation of evidence). Plaintiff's burden of proving that more reliable methods for estimating damages do not exist will not be met if the only reason such other methods are unavailable is that they would necessarily have relied upon documents that are now unavailable due to plaintiff's actions or inactions. *See id.* at 56 ("The court may consider at [trial] whether the loss of the documents affects the weight of the evidence supporting plaintiff's claims and/or defendant's defenses.").[15] Plaintiff bears the burden, under the jury verdict method, of proving that "no more reliable method for computing damages" exists, *Dawco,* 930 F.2d at 880, which in essence requires that plaintiff justify its inability to substantiate the amount of its lost profits damages, *id.* at 881.

The jury verdict method in the *Winstar* lost profits damages context has not yet been "resorted to" by this court.[16] The *Dawco* requirements of clear proof of injury, justification of plaintiff's inabilities to substantiate the amount of its lost profits damages, and sufficiency of the evidence for a fair and reasonable approximation of damages will be used to evaluate the evidence before the court. In doing so, the court is mindful of the instruction of the Federal Circuit in *Bluebonnet* which suggested that the jury verdict method may be appropriate in computing *Winstar*-related damages: "'[i]n estimating damages, the Court of Claims occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties.'" 266 F.3d at 1357 (quoting *Specialty Assembling & Packing Co. v. United States,* 174 Ct.Cl. 153, 184, 355 F.2d 554 (1966)).

## C. Findings of Fact

As an introduction to the court's findings of fact, the court provides an overview of plaintiff's damages model created by Mr. James R. Causey, and addresses a factual dispute about the exclusion by FIRREA of

---

**15.** In the summary judgment opinion in this case, the court noted that, because of the loss or destruction of documents in plaintiff's possession that were subject to a discovery order of the court, "[t]here are gaps in the asset/liability committee minutes, executive committee meeting minutes, Columbia First's accounting ledger, and net worth calculations ... [and] defendant has not had access to any board meeting packages." *Columbia First,* 54 Fed.Cl. at 703 (citations omitted). The court has twice rejected defendant's request for sanctions against plaintiff for the loss of these documents. *See Columbia First Bank, FSB v. United States,* 58 Fed.Cl. at 56 (denying defendant's request to draw adverse inferences from plaintiff's loss of documents); *Columbia First,* 54 Fed.Cl. at 704 (denying defendant's request to dismiss complaint).

**16.** In *Com Fed,* the court offered additional support for its award of lost profits damages based on that plaintiff's damages model by briefly stating an alternative rationale for the quantum: "The court also believes, however, that under the jury verdict method, this amount [$5,602,000] would be a fair and reasonable approximation of the damages caused [by] FIRREA." 59 Fed.Cl. at 351.

the supervisory goodwill from the Family transaction.

Mr. Causey quantified the amount of supervisory goodwill from the Family acquisition that remained on Columbia's books at the time of the breach; of the original $20.9 million that had been subject to amortization since 1985, approximately $14.5 million remained on Columbia's books in 1989. Pl.'s. Opp. at 3 n. 1; Tr. at 849–50 (Mr. Causey). Plaintiff assumes that the breaching provisions of FIRREA immediately excluded the entire $14.5 million of Family supervisory goodwill in December 1989. *See* Tr. at 996–97 (Mr. Causey) (referring to "the 14–and–a–half million that had been taken-that had been excluded as a consequence of the breach of the Family goodwill"); Pl.'s Facts ¶ 18 (asserting that "the [Family] supervisory goodwill was immediately and completely excluded from regulatory capital"); PX 125 Ch. D ("FIRREA Capital Standards Effective December 1989").

Mr. Causey then constructed a but-for bank absent the breach, and a but-for world, in which the only initial difference with the real world is the return of the $14.5 million in regulatory capital to Columbia's balance sheet, as of December 1989. *See* Tr. at 877–78 (Mr. Causey termed the breach a "glancing blow" which "didn't cause any of the other things that the company experienced between 1989 and 1995 to happen or not to happen."); *id.* at 1123 (Mr. Causey stated that "the only thing in that list [of other depletions to capital in 1990 and 1991] that changes is adding back the Family [ ] goodwill at 14–and–a–half million to regulatory capital.").

Mr. Causey then predicts what the performance of this but-for Columbia would have been during two periods of time following the breach: the Shrink Period of 1/1/90 to 6/30/91, and the Growth Period of 7/1/91 through 9/30/95. PX 125 Chs. C, N. It is through the comparison of the performance of the but-for Columbia with the performance of the real-world Columbia for the same two periods of time that plaintiff's expert estimates lost profits of $6.8 million. *Id.* Ch. M. The comparison stops in the fall of 1995 because Columbia was purchased by another bank at that time and Mr. Causey did not believe additional lost profits due to the breach would accumulate thereafter.[17] Tr. at 886 (Mr. Causey).

Mr. Causey's model shows the but-for Columbia "accumulating additional assets" throughout the Shrink Period, in other words, acquiring more assets than did the real-world Columbia during this period. PX 125 at 9–10, 12. In all, according to Mr. Causey, the but-for Columbia would have accumulated approximately $266,526,000 in additional assets during this period, building a portfolio of what plaintiff calls "incremental assets" that exist only in the but-for world. *Id.* at 10, Ch. N; Pl.'s Facts ¶ 35. Mr. Causey's theory is that with the additional $14.5 million in Family supervisory goodwill, the but-for Columbia would have been able to grow rather than shrink during the Shrink Period. Tr. at 880. Plaintiff's damages model applies a 4% annual growth rate estimate during the Shrink Period to Columbia's real world total assets, $2.2 billion as of December 1989, to arrive at the $266,526,000 figure for the incremental assets portfolio. PX 125 at 10.

During the Growth Period, Mr. Causey's model assumes that the but-for Columbia continues to hold the incremental assets portfolio, but that the size of the incremental assets portfolio no longer increases. *Id.* Ch. N; Tr. at 902. The but-for Columbia, slightly larger than the real-world Columbia, is predicted to grow and shrink in a manner that mirrors the real-world Columbia throughout the Growth Period. Tr. at 905–06; Pl.'s Opp. at 29; PX 125 Ch. N.

---

17. The purchasing bank, First Union, was not a party to the Agreement. Plaintiff's expert stated, "I do not believe-it wasn't clear to me that [First Union] would be able to take advantage of the contractual promises that had been made to Columbia First going forward [beyond November 1995]." Tr. at 886. Mr. Causey described the government's breach as a "continuing breach," but one that had a definite end date: "[i]t's simply that the company [Columbia] was breached in 1989 and continued to be breached up until the time it was sold to First Union." Tr. at 1197–98.

The incremental assets portfolio in Mr. Causey's model is composed of an unspecified combination of mortgage-backed securities or residential mortgages. Tr. at 907. These incremental assets would have been funded by liabilities, which would consist of some combination of deposits and/or collateralized borrowings. *See* Tr. at 980–81 (stating that Columbia would have added liabilities to fund the incremental assets portfolio and that these "would be either more re[tail] deposits, more wholesale deposits, or more borrowings, collateralized borrowings"). "Rather than calculate" an earnings figure on the spread in interest rates between the incremental assets and the liabilities which funded them, Mr. Causey calculated an earnings average based on "the actual profitability of the bank." Tr. at 981–82. An earnings figure of .5 percent per year was derived from the real-world Columbia's profitability during the Shrink and Growth Periods. PX 125 Ch. K.

The incremental assets portfolio of Mr. Causey's model is the source of plaintiff's lost profits. Tr. at 921–22. The portfolio that grows to $266,526,000 is projected to earn .5 percent per year during both the Shrink Period and the Growth Period. *Id.;* PX 125 Ch. N. It is the quarterly return on the incremental assets in this portfolio that is totaled in Mr. Causey's model to produce plaintiff's $6.8 million lost profits estimate. PX 125 Ch. N.

The court now addresses the factual dispute about the exclusion by FIRREA of the supervisory goodwill from the Family transaction.

While the parties agree that at the time of the breach, approximately $14.5 million in Family supervisory goodwill remained on Columbia's books as regulatory capital, Pl.'s Opp. at 7; Def.'s Mot. at 21, the parties disagree as to the amount of the Family supervisory goodwill that was excluded during the Shrink Period by the breaching provisions of FIRREA: defendant argues that none of the $14.5 million was excluded during the Shrink Period because plaintiff's total assets were sufficiently large to carry all of the $14.5 million on Columbia's books throughout the Shrink Period, Def.'s Mot. at 21; plaintiff argues that all of the $14.5 mil-

lion was excluded during the Shrink Period because the fully phased-in capital requirements were applied immediately, Pl.'s Opp. at 7; *see also* Tr. at 880, 1122–24 (Mr. Causey); PX 125 at 5.

It is not in dispute that the regulatory capital provisions of FIRREA were phased in over a period of five years, eliminating supervisory goodwill from core capital (one type of regulatory capital) by January 1, 1995. 12 U.S.C. § 1464(t)(3) (2000); Def.'s Mot. at 21–22; Pl.'s Opp. at 7–8. "[F]ully phased-in" capital requirements refer to regulatory capital requirements as of January 1, 1995, Tr. at 863 (Mr. Causey), when zero supervisory goodwill was permitted to be included in core capital, 12 U.S.C. § 1464(t)(3). It is also clear that plaintiff never failed to meet the "current" requirements for regulatory capital imposed by the breaching provisions of FIRREA. Tr. at 667–68 (Mr. Creighton); *see also* Tr. at 191–92 (Mr. Hartwell). According to plaintiff's expert, Columbia continued to record all of its Family-related supervisory goodwill on reports to regulators throughout the phase-in period. Tr. at 1142–46; DX 1500. Both testimony and documentary evidence presented at trial support defendant's assertion that Columbia need not have reduced the Family supervisory goodwill on its books, at least for the Shrink Period. JX 10 at 14 (Columbia's 1990 Annual Report); JX 11 at 16 (Columbia's 1991 Annual Report); Tr. at 753–55 (Mr. Creighton).

Plaintiff presents three arguments in support of its assertion that all $14.5 million of the Family supervisory goodwill was excluded immediately by the breach in December 1989: fully phased-in requirements were "pressed for" by regulators; operating under fully phased-in requirements was "necessary" for acquisitions of other financial institutions; and operating under fully phased-in requirements was "important to the bank's status with the rating agencies ...." Pl.'s Opp. at 7–8. None of plaintiff's arguments is persuasive.

Plaintiff's evidence that regulators used fully phased-in requirements to measure Columbia's financial position during the Shrink Period consists of an observation by regu-

lators that, as of June 30, 1991, Columbia had not achieved fully phased-in capital requirements. JX 287 at 1 (OTS Report of Examination) ("[Columbia, as of June 30, 1991,] failed to meet the fully phased-in risk-based capital requirement by $6,994,000."). In other comments in the same examination, regulators appear to be satisfied with Columbia's capital ratios: "the institution should meet its fully phased-in risk-based capital requirement in [the next] fiscal year," *id.; see also* JX 282 at 2 (OTS Report of Examination) ("As of March 31, 1990, the bank's equity capital totaled $100,325,000 which is considered to be strong. A review of the capital position as [of] the above date revealed that the bank meets all the new capital requirements promulgated under FIRREA."). Plaintiff presented no contemporaneous evidence that federal regulators "pressed for" Columbia's compliance with fully phased-in FIRREA capital requirements before January 1, 1995. Based on the evidence before it, the court finds that Columbia was not being pushed by regulators to meet fully phased-in requirements for regulatory capital during the Shrink Period.

 Plaintiff's argument that operating under fully phased-in capital requirements was "necessary" to achieve growth by acquisitions is irrelevant to plaintiff's damages case at trial. Plaintiff's but-for damages model excludes the possibility that the addition of assets would have been through the acquisition of other banks or thrifts, Tr. at 885–86 (Mr. Causey), even though this source of alleged lost profits damages had been a significant part of its case at the summary judgment stage of this suit, *Columbia First,* 54 Fed.Cl. at 701–02. Loss of leverage capacity for an investment that plaintiff has not shown it would have made absent the breach is not sufficient support for a lost profits damages claim. *See Bank United of Tex., FSB v. United States,* 50 Fed.Cl. 645, 655, 664 (2001) (finding that lost profits would not result unless a plaintiff shows it "was unable to ... use[ ] the leverage capacity," and that plaintiff had not shown it had been prevented from making any investments), *rev'd on other grounds,* 80 Fed.Appx. 663, 2003 WL 22177282 (Fed.Cir. Sept.22, 2003). Because plaintiff does not claim lost profits due to

foregone acquisitions of other financial institutions, the court finds that any claimed constraint on plaintiff's ability to acquire other financial institutions during the Shrink Period is immaterial to plaintiff's case.

Plaintiff's evidence on a bank rating system published by Veribanc, Inc., an entity that rated thrifts for potential depositors, Tr. at 324 (Mr. Schaefer), 567–71 (Mr. Creighton), is also irrelevant to plaintiff's case at trial both because the impact of the breach on the ratings was not proved and, even assuming the impact, plaintiff proved no connection between the impact and the damages claimed.

Prior to the breach, Columbia, from the time of the Family purchase to the implementation date of FIRREA, never exceeded the middle category for safety (yellow) or the upper middle (two star) rating for "future trends and contingencies." DX 2002. After the breach, during the Shrink Period, Columbia's Veribanc rating remained relatively stable, always occupying the middle category for safety (yellow), and varying in its rating between the lower middle category (one star) and the upper middle category (two stars) for future trends. *Id.* In 1993, when Columbia met fully phased-in requirements for regulatory capital, its Veribanc ratings rose to the highest category for safety (green), and the highest category for future trends (three stars). *Id.*

Mr. Schaefer, Columbia's president and CEO from 1989 until 1995, Tr. at 254–55, testified to the dire situation of Columbia and other Washington, DC-area thrifts during the Shrink Period, Tr. at 320–21. The industry was under pressure from "the national economy ... in a tailspin," with a local real estate economy "at [its] lowest point," accompanied by "bank failures," "suspicion in the minds of depositors" and "the inability of the banks to fund the loans that they were already committed to." Tr. at 320–21 (Mr. Schaefer). Plaintiff's evidence does not address the obvious question: why such factors were not equal to or greater than the breach in importance to the ratings. And weighing against a conclusion that the breach was important to the ratings is Mr. Causey's

testimony that the breach was a "glancing blow" which "didn't cause any of the other things that the company experienced between 1989 and 1995 to happen or not happen." Tr. at 878. Furthermore, plaintiff does not connect the alleged harm to its reputation to its claimed lost profits. There is no proof that the Veribanc ratings made it more difficult, for example, for Columbia to attract depositors or obtain money through borrowing. *Cf. Coast Fed. Bank, FSB v. United States*, 48 Fed.Cl. 402, 434–41 (Fed. Cl.2000) (discussing "wounded bank" damages), *aff'd on other grounds*, 323 F.3d 1035 (Fed.Cir.2003).

Columbia has not supported its position that $14.5 million was immediately eliminated from its regulatory capital[18] and has suggested no other figure. Given that Columbia's damages model does not rely on the quantity of lost supervisory goodwill in any of its calculations,[19] the court simply refers to the breach-related loss of regulatory capital as "the excluded Family supervisory goodwill" without making a finding of fact as to a specific dollar figure.

#### 1. Causation

#### a. The "Loss"

The breach in this case is the "change in the treatment of [the Family-related] supervisory goodwill" due to the implementation of FIRREA. *Columbia First*, 54 Fed.Cl. at 696. As Mr. Hartwell testified, a thrift like Columbia in the late 1980s would typically add assets by loaning money or acquiring loans or buying mortgage-backed securities, and would earn money on any positive spread between interest rates on those assets and the interest the thrift was required to pay on deposits, debentures or borrowings that it used to acquire assets. Tr. at 45, 83–86 (Mr. Hartwell).

Plaintiff argues that, absent the breaching provisions of FIRREA and the effect of those provisions on the accounting for the Family-related supervisory goodwill, Columbia would have added assets to its portfolio in the Shrink Period of 1/1/90—6/30/91, and that those assets would have yielded certain returns in the Shrink Period and the Growth Period, 1/1/90—6/30/91 and 7/1/91—9/30/95, respectively. PX 125 at 12, Chs. H, N; Pl.'s Opp. at 1, 11; Pl.'s Facts ¶ 25. Columbia experienced a decline in total assets during the Shrink Period. PX 125 Ch. D; DX 1503.[20] What Columbia must prove is that it would have had more assets in the but-for world than it did in the real world at the end of the Shrink Period, and that these incremental assets would have been profitable.

#### i. Plaintiff failed to prove Columbia would have invested more during the Shrink Period absent the breach

To prove that Columbia would have leveraged the excluded Family supervisory goodwill into additional assets in the but-for world, plaintiff relies principally on the testi-

---

**18.** The court does not intend to suggest that, in other cases, a fully phased-in analysis of FIRREA requirements would be inappropriate in measuring lost profits damages. For example, in *Com Fed*, 59 Fed.Cl. at 346–47, the court did "not believe ... that plaintiff was unreasonable in understanding that FIRREA regulations, as implemented in its case, required the complete elimination of supervisory goodwill in the first year" when there had been confusing communication from government regulators which implied that an immediate phase-out of supervisory goodwill was required. That is not the case here, however.

**19.** Mr. Causey predicts that Columbia's total assets at the beginning of the Shrink Period, $2,173,192,000, would have grown at a quarterly rate of 1% (4% per annum) in the but-for world. PX 125 Ch. N. The calculation of the amount of incremental assets involves only two numbers: Columbia's total assets and the growth rate of 1% per quarter. *Id.* After the six quarters of the Shrink Period, the projected growth would have accumulated $266,526,000 in incremental assets, and Columbia's but-for total assets would have reached $2,306,887,000. *Id.* In plaintiff's damages model, the amount of the breach-related exclusion of regulatory capital during the Shrink Period, whether one uses the $14.5 million figure claimed by plaintiff or some lesser figure, appears to be irrelevant. Neither of the parties suggested that the $14.5 million figure should have been amortized over the five-year phase-out period, and the court sees no need to discuss this alternative.

**20.** DX 1500, 1501, 1502, and 1503 are demonstrative exhibits that defendant used at trial, as the court does here, to summarize financial data relating to Columbia's performance. They were not admitted as factual evidence.

mony of its three fact witnesses, Columbia's business plans pre-FIRREA and its expert's opinions. Plaintiff attempts to show that Columbia had an incentive to add assets during the Shrink Period, and that additional capital would have been used to leverage that asset growth in the but-for world. Pl.'s Facts ¶¶ 25–27.

First, the court turns to the hypothetical composition of the portfolio of investments that plaintiff claims as the basis for its lost profits damages. Here the court is primarily concerned with the types and the respective percent shares of the types of foregone assets that plaintiff claims would have been added in the but-for world, not the claimed size of the incremental assets portfolio.[21]

Plaintiff's expert testified about his assumptions concerning assets that would have been acquired in the but-for world:

> I assumed that the company would have acquired more of the same adjustable rate or short-term residential home loans or mortgage-backed securities, that it acquired, that the bank actually did acquire throughout this same period of time.... I assumed that ..., in fact, the foregone assets would have pretty much exclusively been comprised at a minimum of additional mortgage-backed securities but could possibly have included whole loans as well.

Tr. at 907. This assumption, or a somewhat similar one, is also presented in the summary exhibit of plaintiff's damages model: "Absent the breach, the $267 million of additional assets would have been comprised of more of the same types of adjustable rate and short-term residential home loans and short-term mortgage-backed securities that Columbia First ... otherwise acquired ...." PX 125 at 11.

Columbia's CEO at the time, in his testimony, made two statements as to how Columbia would have leveraged its excluded Family supervisory goodwill absent the breach, both of which offered some support to Mr. Causey's assumptions. In his first comment on the subject, Mr. Schaefer said:

> I believe that we would have been successful in the acquisition of some of the deposit bases that were being offered by the FDIC and that would have increased our deposits .... We would have been able to acquire more mortgage backs, make more mortgage loans, consumer loans.

Tr. at 306–07 (Mr. Schaefer). Consumer loans were not a part of Mr. Causey's model. A few minutes later, Mr. Schaefer refined his prediction and stated that, given more capital, "[w]e would have, during that period, be[en] in first trust residential mortgages and mortgage-backed securities." Tr. at 312. That second, refined, position is consistent with Mr. Causey's model. However, Mr. Hartwell, Columbia's CEO until January 1989, described Columbia's lending activities in fiscal 1989 as: "[Columbia was] going to have an increased role in making business-type loans and relationships with builders and so forth." Tr. at 119 (commenting on Letter to Stockholders in Columbia's 1989 Annual Report (JX 9 at 2–3)). Mr. Hartwell's testimony is inconsistent with the investment assumptions in Mr. Causey's model and Mr. Schaefer's second position on Columbia's but-for investment strategy.

Both the model and Mr. Schaefer's testimony are inconsistent with the contemporaneous documentary evidence about the Shrink Period that was offered into evidence. Two 10–K reports submitted by Columbia to the Office of Thrift Supervision during this period directly contradict the assumption that mortgage-backed securities would be an increasing part of Columbia's asset base: "Columbia First presently has no plans to increase the current volume of its mortgage-backed securities portfolio." JX 313 at 4 (December 22, 1989); JX 314 at 2 (Dec. 26, 1990) (same). The court believes that these contemporaneous statements are more likely indicative of Columbia's Shrink Period investment strategies than Mr. Schaefer's second position or the strategy adopted in plaintiff's damages model. The same business plan that plaintiff's expert used to extrapolate asset growth projections for the Shrink Period, Tr. at 1083–84, also indicated that Columbia

---

**21.** The topic of the alleged size of the incremental assets portfolio is first addressed below in Part II.C.1.b, as it relates to substantial factor causation and the breaching provisions of FIRREA.

was planning, during this period, to increase commercial, consumer and construction loans, Tr. at 1101–02. However, in the but-for world plaintiff's expert concludes that this documented investment strategy would be abandoned in favor of an incremental assets investment strategy of acquiring mortgage-backed securities and residential mortgages. Tr. at 1106.

Plaintiff's expert acknowledged that the but-for asset portfolio does not reflect the diversity of Columbia's assets in the real world. *See* Tr. at 1037 ("Q[:] In the but-for world, you assume that all the incremental assets are not as diverse [as Columbia's real-world assets]; is that true? [Mr. Causey:] Yes."). Nor did that portfolio accurately reflect the investment strategies Columbia had during this period. *See* JX 10 at 5, 32 (Columbia's 1990 Annual Report produced in December 1990, well into the Shrink Period, states: "[m]anagement has attempted to shift earning assets from mortgage-backed securities to loans receivable and loans held for sale.... The shifting of resources from mortgage-backed securities to loans receivable reflects management's strategy to use repayments and sales from fixed-rate securities and loans to fund variable-rate residential, commercial and construction loans for portfolio."). The court finds that the types of assets in plaintiff's alleged but-for incremental assets portfolio are speculative and unmoored in the factual evidence presented at trial.

It is not only the general types of alleged foregone assets, but their relative percent shares in the incremental assets portfolio, that plaintiff has failed to prove during trial. Plaintiff's expert asserted that knowing the percent shares of mortgage-backed securities and residential mortgages in the asset portfolio was "ultimately not necessary." Tr. at 970–71; *see* Tr. at 972 ("I believe that what I said is that they [Columbia] would have either been [in] all mortgage-backed securities or something less. So it [the incremental assets portfolio] could have been 100 percent [mortgage-backed securities] or something

less."). Plaintiff's expert stated as his opinion that the supply of mortgage-backed securities and residential mortgages was sufficient to permit Columbia to purchase an additional $266 million of these assets in some combination. Tr. at 905–09, 1028. He also opined that the percentage of these two general types of assets in the incremental assets portfolio is unimportant in calculating damages. Tr. at 970 ("Q[:] In fact, the precise combination of the asset mix in your but-for world is irrelevant to you; isn't that true? [Mr. Causey:] Ultimately, by the way I constrain lost profits."). The court disagrees with the latter opinion. The burden is on plaintiff to prove that it incurred losses as a result of the breach. Plaintiff has not proven what Columbia would have done with its but-for capital.[22]

The court finds that plaintiff failed to prove that it would have invested more through the incremental assets portfolio in plaintiff's damages model.

ii. Plaintiff failed to prove that its additional investments would have been profitable

■ The court now discusses plaintiff's evidence of profitability of its alleged incremental assets portfolio. To prove profitability, plaintiff must show that there was an adequate interest spread between the alleged incremental assets and the liabilities which funded them, and that risk factors would not have erased the expected profits.

Plaintiff alleged some general types of foregone assets, mortgage-backed securities and residential mortgages, without identifying percent shares of these in the incremental assets portfolio. Tr. at 972 (Mr. Causey). Within these general types, plaintiff did not specify the proportions of the mortgage-backed securities and residential mortgages that would have been adjustable-rate or fixed-rate (although Mr. Causey testified that the foregone assets were "predominantly" adjustable rate). *See id.* ("Its [Columbia's]

---

**22.** In *Cal Fed II*, plaintiff presented an incremental assets model for lost profits. 54 Fed.Cl. at 708, 711–12. Plaintiff in that case failed to prove an injury because too many variables might have affected the profitability of the but-for assets portfolio. *Id.* Here, the portfolio composition is so vague that speculations about its profitability are even less useful.

focus in the actual world was predominantly on adjustable-rate assets. So that's what would have been the focus in the but-for world."); Tr. at 907 (Mr. Causey) (stating that "the company would have acquired more of the same adjustable rate or short-term residential home loans"). Plaintiff was unable to specify whether the assets would have been acquired through retail or wholesale operations or, in other words, whether Columbia would have originated or purchased mortgage loans. Tr. at 966–69 (Mr. Causey). Plaintiff's expert agreed that price and yield would vary based on where loans were originated, Tr. at 1009, and that mortgage-backed securities and mortgage loans generally carried different risks, Tr. at 1012–13. Plaintiff did not provide any quantification of the foregoing variables or any suggestions as to how the nature of the variables could impact the results yielded by plaintiff's damages model. Based on these gaps in plaintiff's case, the court finds that plaintiff has failed to prove even a rough estimate of interest earnings and risk associated with its alleged incremental assets.

On the funding side, plaintiff claimed that Columbia would have used deposits and borrowings in some combination. Tr. at 980 (Mr. Causey). The deposits, plaintiff suggested, could either be retail deposits at Columbia branches or jumbo deposits by institutional depositors who would acquire certificates of deposit. Tr. at 968–70 (Mr. Causey). Mr. Causey also suggested that borrowings would have been Federal Home Loan Bank Board (FHLBB) advances. Tr. at 981 (Mr. Causey). Plaintiff's expert asserted that it was "not necessary" to know what combination of liabilities would have funded the but-for assets in order to prove damages. Tr. at 981–82. The court disagrees. At least one factor in profitability is interest rate risk; for example, a bank may pay too much interest on deposits to make a profit on its assets. *See* Tr. at 643–44 (Mr. Creighton) ("[O]ur [Columbia's] goal was to have those assets reprice approximately coincidentally with the liabilities,

whether they be three-month CDs or borrowings, one-month CD[s] or borrowings, one-year CDs or borrowings ...."). Because plaintiff did not provide any specificity as to the liabilities with which it would have funded the incremental assets portfolio, the court is unable to determine the existence of an interest spread that would be the basis of profitability.[23]

Plaintiff's expert did not provide any evidence as to the risks that might have affected the profitability of the incremental assets portfolio in his model, other than to state generally that "in the but-for world, the resulting bank would have had the same level of profitability as the actual bank." Tr. at 1019. However, there was uncontradicted evidence of significant risks in the banking industry during the Shrink Period. "[T]he real estate market was just awful in the late [19]80's, early [19]90's, in the Washington, DC area." Tr. at 552 (Mr. Creighton). In the Shrink Period, there were "loan problems" related to the falling real estate market, Tr. at 320 (Mr. Schaefer), and troubles getting and keeping deposits, Tr. at 321–22 (Mr. Schaefer). Adjustable rate mortgage-backed securities had prepayment risk. Tr. at 742 (Mr. Creighton). Columbia experienced a loss of $2.9 million in fiscal year 1990, "primarily due to increased loan loss provisions." Joint Stip. ¶ 24.

Despite the uncontradicted evidence of a number of significant risks, plaintiff's expert did not quantify the impact of the risks on its damages model except to say that "[the impact of the recession on thrift growth rates is] part of the economic environment that I considered." Tr. at 1116–19. Except for Mr. Causey's conclusory assertion that he "considered" risks in constructing the damages model, *see* PX 125 at 7 (stating that Mr. Causey "also considered changes in general economic conditions and market interest rates"), plaintiff has not offered any evidence tending to show that risk factors during the Shrink Period would not have eliminated profits from its incremental assets portfolio.

---

23. In *Cal Fed II*, plaintiff similarly presented no evidence on liabilities which would have funded foregone assets, and the court quoted defendant's expert: " 'any opinion about lost profits is specu-

lative .... [T]he spread that [plaintiff's expert] calculates on these [assets], it's not a product of analysis; it's a product of assumption ....' " 54 Fed.Cl. at 710.

In fact, Columbia's 1990 Annual Report indicated that during fiscal year 1990 Columbia was decreasing its assets in residential mortgages and increasing its assets in construction, commercial and unsecured loans. Tr. at 748 (Mr. Creighton); JX 10 at 22 (Columbia's 1990 Annual Report). This trend in investing, if followed in the but-for world, would have exposed Columbia to greater risk of losses during the recession. *See* Tr. at 1202 (Mr. Causey stated that real-world Columbia's losses during the Shrink Period "are not attributable to its single-family [residential mortgage] lending or mortgage-backed securities, but to specific problems in its commercial loan portfolio.").

For the Growth Period, plaintiff has again provided no persuasive evidence as to the risk level that would have affected its incremental assets portfolio. As of December 1992, Columbia commented in its Annual Report on "economic problems throughout our [market] area," the "economic recession [that] continues to devastate many local and regional financial institutions" and the problem of "interest rate risk ... as a result of changes in interest rates." JX 12 at 2, 37 (Columbia's 1992 Annual Report). Mr. Schaefer testified in general terms that profitability improved for Columbia after 1992. Tr. at 340. Based on all the evidence, plaintiff has not met its burden of showing that its incremental assets portfolio would have been profitable in the face of risk factors present during the Growth Period.

The court finds that plaintiff has failed to prove that the alleged incremental assets portfolio, as described in its damages model, would have been profitable in the but-for world.

### b. Substantial Factor Causation

To satisfy the causation element of lost profits, plaintiff must prove that the unavailability of the excluded Family supervisory goodwill from January 1, 1990 to June 30, 1991 (the Shrink Period) directly caused Co-

lumbia to forego $266,526,000 in asset growth. Plaintiff must also prove that the unavailability of the excluded Family supervisory goodwill was the primary cause of these foregone assets; in other words, plaintiff must prove that the breaching provisions of FIRREA, not other events or conditions, were the primary cause of the loss of the foregone assets. Finally, plaintiff must prove that the $266,526,000 of incremental assets in the but-for world would have earned $6.8 million in profits between January 1, 1990 to September 30, 1995 (the Shrink Period and the Growth Period) as claimed in its damages model. While all three elements of proof are needed for causation, the court will postpone its discussion of the $6.8 million in profits figure to Part II.C.3 of this opinion, where certainty of amount is the focus of the court's analysis.

i. Plaintiff failed to prove that the phase-out of supervisory goodwill directly caused the lost profits damages claimed

Plaintiff's expert chose an asset growth estimate of 4 percent per annum for the but-for Columbia during the Shrink Period. Tr. at 901; PX 125 Chs. H, N. This estimate is not supported by the evidence presented at trial. There was only one business plan, for 1989–90, admitted at trial which plaintiff relied on as a source for the 4 percent annual asset growth estimate.[24] JX 32. The 1989–90 business plan was prepared by investors in Columbia, not its management, *id.* at 0204; Tr. at 1087, relies mostly on public, not internal documents, JX 32 at 0206; Tr. at 1087, and was not familiar to Columbia's CEO or other officers, see Tr. at 445–46 (Mr. Schaefer), 1096 (Mr. Causey). Despite its apparent remoteness from Columbia's actual business strategies during the Shrink Period, the 1989–90 business plan was the sole document at trial introduced to support plaintiff's 4 percent annual asset growth figure. The plan projects a growth in total assets for Columbia of 3.01 percent, from 1989 to 1990.[25] JX 32 at 0224. Plaintiff's expert

24. Plaintiff's expert, Mr. Causey, said he used several business plans to produce his estimate of 4 percent asset growth, Tr. at 1080–82, but none of these other business plans was offered or admitted into evidence at trial as proof of asset growth projections.

25. Plaintiff's expert, Mr. Causey, did not know if the 1989–90 plan used a fiscal or calendar year.

testified that he used 4 percent, however, because he believes the 1989–90 business plan does not account for the acquisition of Maximum in 1990. Tr. at 1084–86. Mr. Causey "adjusted" the annual growth rate projected in this plan to 4% because the Maximum transaction brought in an additional $116 million in assets. PX 125 at 10. Whether or not this plan contemplated acquisitions of other financial institutions is not clear. *See* JX 32 at 0210 (stating that Columbia "should also continue its carefully planned expansion into adjacent geographic areas as opportunities present themselves and as conditions warrant"). Plaintiff's 4 percent annual growth estimate is not adequately supported by the evidence. Plaintiff's causation theory depends entirely on the 4 percent asset growth estimate, PX 125 Ch. H; Tr. at 960. There is no other support for the $266,526,000 incremental assets figure.[26]

Plaintiff's expert, having arrived at the sum of $266,526,000 in foregone assets, testified that this foregone growth was directly caused by the unavailability of the excluded Family supervisory goodwill, and by nothing else. Tr. at 959. In the real world, Columbia's assets shrank during this period, with Columbia's total assets decreasing approximately $133,000,000 during the Shrink Period. PX 125 Ch. N. Plaintiff's expert attributes about half of the foregone assets in the incremental assets portfolio to a reversal of the real-world shrinkage, and about half to a net gain in assets. *Id.* Chs. H, N. Plaintiff's explanation for this turnaround in an "unprecedented" economic downturn[27] is that the but-for Columbia would have leveraged the excluded Family supervisory goodwill to achieve 4 percent annual growth for the $2.17 billion in assets that Columbia had at the beginning of the Shrink Period. ·Tr. at 897–98 (Mr. Causey).

However, no contemporaneous document was admitted into evidence that suggested Columbia shrank because of the breach, or that Columbia did not grow because of the breach. None of the testimony of Columbia's fact witnesses indicated that $266,526,000 would be a correct estimate for foregone assets that Columbia could have acquired by leveraging the excluded supervisory goodwill during the Shrink Period. Neither Mr. Creighton, who became Columbia's CFO sometime in 1991,[28] nor Mr. Schaefer, Columbia's CEO throughout the Shrink Period, attempted to quantify the impact of the phaseout of Family supervisory goodwill. Nor did Mr. Hartwell, a member of Columbia's Board of Directors during the Shrink Period. He simply referred to the loss of breach-related supervisory goodwill as "quite a blow and quite a disappointment." Tr. at 125.

There has only been one *Winstar*-related case to date where the leverage model has been found to prove lost profits damages. *See Com Fed,* 59 Fed.Cl. at 344 (noting "[p]laintiff's fundamental claim . . . that such breach caused them to for[e]go investment opportunities to leverage that capital"). In *Com Fed,* the plaintiff was able to present contemporaneous documentary evidence that the bank managers shrank the bank in response to the loss of supervisory goodwill:

> "To achieve this [meeting fully phased-in requirements for supervisory goodwill] we are taking the position of not only no-growth, but of shrinking the Association from approximately $269,000,000 to $255,000,000."

*Id.* at 343 (quoting minutes of the plaintiff's Asset/Liability Committee). In this case, no factual evidence was presented that supported plaintiff's estimate of $266,526,000 in foregone assets.

Tr. at 1084–85.

**26.** Plaintiff's expert, Mr. Causey, increases Columbia's total assets at the beginning of the Shrink Period, $2,173,192,000, by applying a quarterly growth of 1% (4% per annum). PX 125 Ch. N. After the six quarters of the Shrink Period, the growth has accumulated to $266,526,000 in incremental assets, and Columbia's but-for total assets have reached $2,306,887,000. *Id.* There are no mathematical elements other than the total assets figure and the 4% annual growth rate in this calculation.

**27.** JX 10 at 3 (Columbia's 1990 Annual Report).

**28.** Mr. Creighton joined Columbia in November 1990 and was familiar with some of the bank's financial decision-making during the latter part of the Shrink Period. Tr. at 553–54.

The court finds that plaintiff failed to prove that the excluded Family supervisory goodwill directly caused the lost profits damages claimed.

ii. Plaintiff failed to prove that the excluded Family supervisory goodwill primarily caused the lost profits damages claimed

Plaintiff's damages model did not adequately address other possible causes for Columbia's failure to maintain asset growth of 4 percent per annum during the Shrink Period. In the but-for world, several other non-breach-related losses of capital affected Columbia's balance sheet. The $15.7 million PICC from the Family transaction was immediately excluded as regulatory capital by FIRREA. Tr. at 327–28 (Mr. Schaefer), 998 (Mr. Causey). Columbia had issued $27.8 million of subordinated debentures in the late 1980s and FIRREA excluded these debentures from regulatory capital as well. Joint Stip. ¶ 19, Tr. at 998 (Mr. Causey). FIRREA also phased out the supervisory goodwill from the First Federal acquisition which, as of September 30, 1989, provided about $7 million in regulatory capital for Columbia. Tr. at 998, 1115 (Mr. Causey). Plaintiff's expert conceded that these non-breach-related losses of regulatory capital could have, under his methodology, supported the 4 percent annual growth of Columbia during the Shrink Period if they had been available in the but-for world. Tr. 1137.

In addition, other types of capital were lost, not just regulatory capital. Some of Columbia's earnings during this time, which might have otherwise "add[ed] to the capital base," were being diverted to the general valuation allowance (GVA) on its balance sheet, to support poorly collateralized loans. Tr. at 281–82 (Mr. Schaefer). Other deductions from capital were used to fund loan loss reserves, and plaintiff's expert agreed that Columbia funded about $28.8 million of loan loss reserves in fiscal years 1990 and 1991. See Tr. at 1121 ("It [$28.8 million figure]—it's—on a cumulative basis, it's probably

[about] right."). Plaintiff's expert also testified that Columbia's loan loss reserves, if returned to capital in the but-for world, could have supported the 4 percent annual growth of his damages model. Tr. at 1137.

The court finds that numerous non-breach-related factors, including FIRREA-related exclusions from regulatory capital or depletions of capital due to problem loans during the Shrink Period, could have been the cause of Columbia's failure to grow at 4 percent annually. No evidence was submitted from which it could be inferred that the phase-out of Family supervisory goodwill was the primary cause of the alleged foregone growth in assets.

The court finds that plaintiff failed to prove that the breach was the primary cause of its alleged lost profits.

2. Plaintiff failed to prove that its alleged lost profits were foreseeable

Plaintiff's burden at trial was to show that its alleged incremental assets portfolio was composed of investments that were " 'in the usual course of events.' " *See Chain Belt*, 127 Ct.Cl. at 59, 115 F.Supp. 701 (citation omitted). One way to do this would have been to track assets that were sold during the Shrink Period, because real-world assets sold as a result of the breach could form a foreseeable portfolio of investments that in the but-for world might have been profitable for Columbia.[29] Here, plaintiff's expert never analyzed evidence concerning what assets Columbia sold during the Shrink Period. Tr. at 1063–64 (Mr. Causey).

Another alternative would have been for plaintiff to construct a model based on an incremental assets portfolio that mirrored the bank's actual asset portfolio in the real world. One of the potential pitfalls of this approach is that this court has rejected models that use more-of-the-same foregone assets projections without identifying specific types of investment opportunities. *See, e.g., Southern National*, 57 Fed.Cl. at 306 (dismissing a claim based on a lost profits model that "does not attempt to customize the but-

---

29. *But cf. Cal Fed II*, 54 Fed.Cl. at 707–08 (finding that a sale of assets was not foreseeable, even though plaintiff alleged 25,000 adjustable rate mortgages had been sold due to the breach, because the sale was "too remote and too uncertain to allow recovery").

for world by identifying types or categories of investment opportunities"); *Fifth Third*, 55 Fed.Cl. at 240 (rejecting a lost profits model which "assum[ed] that the But–for– Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged"). The obvious way to avoid such a pitfall is to submit evidence about the availability of typical investments, the history of the bank in pursuing those investments, and the capacity of the but-for bank to take advantage of those investments. In *Com Fed*, the plaintiff offered credible evidence of the availability of investment opportunities, 59 Fed.Cl. at 349 n. 29, the history of investment practices, *id.* at 349, and the bank managers' ability to invest for growth, *id.* at 345, 349. Here, plaintiff's model does not reflect the diversity of its real-world portfolio. Tr. at 1035–36 (Mr. Causey).

Instead, plaintiff's expert uses "hindsight," Tr. at 964, to create an incremental assets portfolio different from Columbia's real-world assets and fails to explain the difference:

Q[:] So it [Columbia] would have changed its [investment] philosophy with respect to the incremental assets [from that which] it had with respect [to] all its other assets?

[Mr. Causey:] No.

Q[:] And–I apologize, sir, because it [the difference in actual assets from incremental assets] seems inconsistent to me.

. . . .

[Mr. Causey:] I think they [Columbia] determined that the business environment was not conducive to pushing forward, to further advances on the commercial lending side.

. . . .

Q[:] In the but-for world, you assume that all the incremental assets are not as diverse; is that true?

[Mr. Causey:] Yes.

Q[:] That they would not include consumer loans, commercial loans, construction loans?

[Mr. Causey:] The incremental assets would not.

Tr. at 1033–37. This explanation would make some sense if in fact in the real-world Columbia had stopped making consumer loans, commercial loans, and construction loans based on this alleged reaction to the business climate. The business climate is the same in the but-for world and the real world. Tr. at 878–79 (Mr. Causey). In the real world, Columbia did not restrict itself to acquiring only mortgage-backed securities and residential mortgage assets during the Shrink Period. Tr. at 1216–17 (Mr. Causey). Mr. Causey's decision to shift Columbia's investment philosophy in the but-for world remains unexplained.

The court finds it more probable that Columbia's investment philosophy in the but-for world would have been much as it was in the real world. In both the but-for world and the real world Columbia had to deal with risk-weighting of assets, a non-breaching FIRREA provision.[30] According to Mr. Creighton, this provision provided an incentive to invest more in mortgage-backed securities and in residential mortgages, Tr. at 576–77. Notwithstanding the incentive, in the real world Columbia made several heavily risk-weighted non-residential loans during this period and lost money on them. *See* Tr. at 405–27 (testimony of Mr. Schaefer confirming seven loans Columbia made in 1990 adding up to more than $35 million in unprofitable loans). There is no contemporaneous documentary evidence that indicates that the real-world Columbia restricted its investments to mortgage-backed securities and residential mortgages during this period; in fact, as discussed above,[31] contemporaneous

---

**30.** Risk-weighting assigned risk to the type of asset categories on a bank's balance sheet and, because it required capital in the risk-weighted amount to carry those assets, favored mortgage-backed securities, 20% risk-weighted, and residential mortgages, 50% risk-weighted, over commercial, construction, and consumer loans, all 100% risk-weighed. Tr. at 558–59, 573, 576–77 (Mr. Creighton).

**31.** *See supra* Part II.C.1.a.i.

documents indicate that plaintiff's incremental assets composition did not reflect Columbia's investment strategy during this period.

Plaintiff has not proved that its incremental assets portfolio was " 'in the usual course of,' " *Chain Belt,* 127 Ct.Cl. at 59, 115 F.Supp. 701 (citation omitted), or even arguably consistent with, the investment patterns of Columbia during the Shrink Period.

### 3. Reasonable Certainty of Amount

#### a. Plaintiff's damages model was not based on sufficient evidence

There was insufficient evidence from which the court could infer that, absent the breach, plaintiff would have acquired a $266,526,000 incremental assets portfolio. *See supra* Part II.C.1.b.i. There was insufficient evidence to support the conclusion that, absent the breach, plaintiff would have invested *solely* in mortgage-backed securities and residential mortgages. *See supra* Part II.C.1.a.i. There was no fact evidence submitted which gave specific interest rate, term or risk data for the incremental assets, nor was any evidence submitted which gave interest rate, term or risk data for the liabilities with which Columbia would have funded the incremental assets. *See supra* Part II.C.1.a.ii.

The court finds that the evidence introduced in plaintiff's case-in-chief did not provide a basis upon which an estimate of lost profits could reliably be made.

#### b. Plaintiff's damages model relied on assumptions and calculations insufficiently supported by the evidence

As discussed above,[32] plaintiff's model makes numerous assumptions that are unmoored in the factual evidence presented at trial or stipulated to by the parties. The model assumes asset growth of 4 percent annually during the Shrink Period, despite a major real-world recession and real-world shrinkage, and assumes that Columbia would have made no additional construction, commercial or consumer loans during the Shrink Period in the but-for world if it had had additional regulatory capital. Both of these pivotal assumptions are unsupported by facts

in evidence. Plaintiff also assumed that Columbia was deprived of $14.5 million in regulatory capital during the Shrink Period; the court found that the amount of the excluded Family supervisory goodwill during of the Shrink Period was not the full $14.5 million and that no other figure was established.

The multiplier that plaintiff's expert, Mr. Causey, used to estimate lost profits for Columbia on the hypothetical incremental assets portfolio was 50 basis points. Tr. at 1162, PX 125 Ch. N. Mr. Causey derived this figure by calculating the return on average assets (ROAA) for Columbia's real-world total assets during the Shrink and Growth Periods. PX 125 Ch. K. According to plaintiff, during the Shrink and Growth Periods Columbia's real-world assets included less than 80 percent mortgage-backed securities and residential mortgages. *Id.* Ch. I. The alleged incremental assets portfolio is 100 percent mortgage-backed securities and residential mortgages. Tr. at 1163–64 (Mr. Causey). Plaintiff is thus using the average rate of return on a diverse asset base to estimate the average rate of return on an asset base composed of an asset mix that is different in more than twenty percent of the assets.

There are several other problems with plaintiff's use of the 50 basis points figure. Defendant cites one example of a one-time gain skewing a quarterly ROAA figure, an event which occurred when Columbia sold two bank branches in Maryland. Tr. at 1173 (Mr. Causey). Defendant also argued that the average return on assets figure can be quite different from the actual earnings on a particular type of asset funded by a particular type of liability. *See* Def.'s Facts at 142 (stating that a particular mortgage-backed securities interest rate spread over the liability was "significantly less than the 50 basis points [Mr. Causey] uses" and that this "illustrates how important the asset/liability mix is"). Mr. Causey conceded that, for 1990, mortgage-backed securities assets might have earned only 27 basis points when funded with FHLBB borrowings, as posited by Mr. Causey's model. Tr. at 1183. Finally, the calculation of interest rate spreads be-

---

32. *See supra* Parts II.C.1 and II.C.2.

tween mortgage-backed securities and FHLBB borrowings that Mr. Causey used to test the reasonableness of his 50 basis points estimate does not take into account prepayment risk that could have lowered earnings on the incremental assets as interest rates fell in the 1990s. See Tr. at 1039–43, 1174–75, 1186–90 (Mr. Causey); JX 13 at 7 (Columbia's 1993 Annual Report).

The court finds that the earnings estimate of 50 basis points in the but-for world is insufficiently rooted in the evidence in the real world to support damages in any reasonably certain amount.

c. Plaintiff's damages model was not credible

At the beginning of the Shrink Period, the real-world Columbia had approximately $2.17 billion in assets. PX 125 Ch. N. By the end of the Shrink Period, the real-world Columbia had shrunk to approximately $2.04 billion in assets. *Id.* Plaintiff's expert asserted that there could be no alternative explanation, other than the breach, as to why Columbia did not have $2.307 billion in assets at the end of the Shrink Period, as predicted by plaintiff's damages model. Tr. at 959. On a graph depicting this real-world decline in total assets, a jagged downward line, Mr. Causey has drawn a straight line rising at 4 percent per year, reflecting his hypothesis that Columbia would have evenly overcome the recession, significant losses on bad loans, and other losses to capital caused by the non-breaching provisions of FIRREA, if only the supervisory goodwill from the Family transaction had not been phased out. *See* PX 125 Ch. H. The court finds this hypothesis unpersuasive.

Mr. Causey stated that he took into account the other factors that could have explained Columbia's failure to achieve his proposed but-for-the-breach 4 percent annual growth during the Shrink Period. *Id.* at 7; Tr. at 1110–14, 1117–20. Plaintiff's expert listed in his summary exhibit some of the events that affected the but-for-the-breach Columbia:

_____[ ] I also considered changes in general economic conditions and market interest rates, especially during the period from 1989 through 1995, including those related to:

The Gulf War

Fluctuating oil prices

The economic recession and significant downturn in the local real estate market of the early 1990s

The run-up of market interest rates in 1989 and their subsequent decline and the run-up of market interest rates in 1994 and their subsequent decline (Chart E)

[ ] In addition, I considered the following:

The non-breaching provisions of FIRREA, that among other things, excluded Columbia First's convertible subordinated debentures from Tier I measures of regulatory capital . . . .

PX 125 at 7. Mr. Causey did not, however, quantify the effects of these other factors on Columbia's potential for growth, and the nature of his "consideration" of these factors remains a mystery to the court after hearing his testimony:

_____Q[:] And recessions generally cause a reduction in thrift growth rates, don't they?

[Mr. Causey:] That is often the case, yes.

Q[:] Would you agree with me that that is frequently the case?

[Mr. Causey:] Yes.

_____Q[:] Did you do any analysis concerning thrift or growth rates in general in the early 1990s as part of preparing your report in this case?

[Mr. Causey:] Yes.

_____Q[:] You did? Is that in your report, DX 571?

[Mr. Causey:] It's part of the economic environment that I considered. I—I don't think I listed it out as a specific item.

Tr. at 1117.

All of Mr. Causey's responses to questions of this kind, as to whether other factors than the breach were considered, were cursory and uninformative as to how he considered these negative growth factors and used them in his calculations. *See, e.g.,* Tr. at 887 (Answering a question concerning how "the Gulf war, fluctuating oil prices, the economic re-

cession, [and the] run up in interest rates" influenced his opinions, Mr. Causey responded, "I think it puts into context the fact that the company was not operating in a vacuum."); Tr. at 891 (Answering a question concerning how the non-breaching provisions of FIRREA influenced his expert opinion, Mr. Causey responded, "[W]ell, they make, I think, they really highlight the huge significance of the breach."). The court did not find plaintiff's expert opinions credible as they pertained to possible alternative explanations for Columbia's lack of growth during the Shrink Period.[33]

On several occasions during trial, Mr. Causey asserted that his lost profits estimates were "constrain[ed]," Tr. at 970, "conservative," Tr. at 962, or "actually [ ] pretty low number[s]," Tr. at 920. The court believes that the $266,526,000 hypothetical incremental assets portfolio made up of low-risk, profitable assets is exactly the opposite of a conservative estimate; rather, it is speculative and optimistic. Even if Mr. Causey's 50 basis points multiplier had been substantiated at trial, the court has no proven estimate of the amount or type of assets upon which to use the earnings multiplier. For the foregoing reasons, the court did not find plaintiff's damages model and its estimate of $6.8 million in lost profits to be credible.

**4. Plaintiff's case did not meet the requirements for a jury verdict method award of damages**

**a. Plaintiff did not establish clear proof of injury**

As discussed above,[34] plaintiff has not shown that Columbia would have invested more, or that such investments would have been profitable, absent the breach. Thus, there is no clear proof of injury in this case, as is required for the use of the jury verdict method.

**b. Plaintiff did not justify its inability to substantiate alleged lost profits**

Defendant criticizes plaintiff's expert for relying upon "countless speculative assumptions." Def.'s Mot. at 31. Plaintiff counters that no more reliable method exists-that a "hypothetical" model such as the one it used for calculating "what Columbia would have done in a 'but-for' breach world" is needed. Pl.'s Opp. at 36. Of course, this court does not reject out of hand the use of hindsight[35] and the modeling of lost profits. *See Com Fed,* 59 Fed.Cl. at 351 ("Although plaintiff's model uses a process of projection, it is grounded in the actual performance of the bank both pre-FIRREA and post-[1994]."). Here, the fundamental flaw of plaintiff's

---

**33.** Plaintiff's expert arrived at a $6.8 million lost profits damages figure twice-once in his first expert report when considering both the loss of the $15.7 million PICC *and* the phase-out of $14.5 million Family supervisory goodwill as "the breach," and in a later report when plaintiff was claiming lost profits only for the breach of the promise related to supervisory goodwill. Tr. at 1111, 1129, 1158–59. Mr. Causey's testified that, although the loss of the PICC harmed Columbia, it did not contribute to the damages he had calculated to be $6.8 million. Tr. at 884. This is just one example, of many, of Mr. Causey's opinions that were not credible because, among other reasons, they were both counterfactual and counterintuitive.

**34.** *See supra* Parts II.C.1.a.i and II.C.1.a.ii.

**35.** One of the dangers of hindsight, however, is that witnesses may color their opinions about past investment strategies to conform with what they now know of business conditions that would have impacted the future of but-for investments. *Glendale Fed. Bank, FSB v. United States,* 43 Fed.Cl. 390, 400 (1999) ("It [now that time has passed since the breach] also means that post

hoc reconstructions [of but-for investment strategies to leverage foregone supervisory goodwill] of this sort are likely to be colored by knowledge of what actually happened, and similarly [are] not credible, absent the existence of less ambiguous or conflicting contemporaneous evidence."), *aff'd, in part, vacated in part, remanded on other grounds,* 239 F.3d 1374 (Fed.Cir.2001). To the limited extent that plaintiff's fact witnesses supported Mr. Causey's damages model and its investment assumptions, the court weighed contemporaneous evidence more heavily than the hindsight of fact witnesses. Defendant argued that because plaintiff's fact witnesses were paid by plaintiff for some of the time these witnesses spent testifying during the course of this litigation, Tr. at 135, 347–48, 656, that "[n]on-[c]ontemporaneous, [c]onclusory [a]nd [s]elf-[s]erving [t]estimony [o]f [f]inancially [i]nterested [p]arties [i]s [i]nsufficient [t]o [s]ustain Columbia's [c]ausation [b]urden," Def.'s Reply at 4. The court declines to infer that self-interest somehow diminished the value of the testimony of plaintiff's fact witnesses.

damages model is not that it uses but-for projections, but that these but-for projections are not rooted in and frequently conflict with the factual evidence presented to the court. *See supra* Parts II.C.1, II.C.2, and II.C.3.a.ii.

The court notes that plaintiff lost 31 boxes of documents, the entire yield of its search for documents relevant to the breach, that were stored in preparation for this lawsuit. Defendant's Proposed Findings of Uncontroverted Facts of August 1, 2002 (Def.'s 2002 Facts) ¶¶ 48–49, 54. Plaintiff had previously culled and made copies of some of these documents that it deemed relevant and helpful. Def.'s 2002 Facts ¶ 50. Plaintiff does not dispute these facts. Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Facts in Connection with Defendant's Motion for Summary Judgment upon Plaintiff's Damages Claims ¶¶ 48–49, 50, 54. Because plaintiff had control of contemporaneous documents which might have been relevant to its lost profits claims, and because plaintiff lost those documents, the court finds that plaintiff has not justified its inability to substantiate alleged lost profits damages.

The court finds that plaintiff has not proven that no other reliable method exists for computing damages.

 c. Plaintiff's case-in-chief did not provide evidence sufficient for a fair and reasonable approximation of damages

Plaintiff did not prove how much Family-related supervisory goodwill was actually made unavailable by the breach during the Shrink Period. *See supra* Part II.C. The types and percent shares of assets in plaintiff's alleged incremental assets portfolio were not proven by factual evidence at trial. *See supra* Part II.C.1.a.i. The evidence submitted at trial was not sufficient to establish the interest spread profitability or risk-levels of the assets in this but-for investment portfolio. *See supra* Part II.C.1.a.ii.

Plaintiff's 4 percent per annum growth assumption for Columbia in the but-for world was not supported by the evidence. *See supra* Part II.C.1.b.i. There was insufficient evidence of causation to support damages in the amount of $266,526,000. *See id.* There was insufficient evidence to permit the court

to separate the effects of the breach from other possible causes of demonstrably significant impact. *See supra* Part II.C.1.b.ii. Plaintiff presented no evidence of specific assets sold due to the breach and the lost profits associated with those sales. *See supra* Part II.C.2. There was insufficient evidence that plaintiff's alleged incremental assets portfolio was foreseeable, because the evidence showed that the investments in the hypothetical incremental assets portfolio were not consistent with Columbia's usual investments in the relevant time period or with its contemporaneously documented investment strategy. *See id.* The evidence submitted at trial did not support plaintiff's earnings estimate for the incremental assets, used for both the Shrink Period and the Growth Period, of 50 basis points. *See supra* Part II.C.3.b.

Plaintiff offered no evidence, and no expert opinion interpreting that evidence, of the relative impacts of negative business conditions, non-breach-related losses of regulatory capital due to FIRREA, and the breach. *See supra* Part II.C.3.c. Plaintiff offered the court no alternative mathematical formula for calculating damages that was not based on plaintiff's expert model and its flawed assumptions and calculations.

For the foregoing reasons, the court finds that the evidence adduced is not sufficient to support a fair and reasonable approximation of damages.

 d. In the court's best judgment zero damages were proved

There is no doubt in this case that defendant breached its promise to plaintiff regarding supervisory goodwill from the Family transaction. Joint Stipulation of April 16, 2002. Plaintiff was unable to prove, however, that *any* damages flowed from the breach. Plaintiff's damages estimate of $6.8 million is the product of assumptions that are insufficiently supported by the evidence before the court. Plaintiff has offered the court no alternative mathematical formula for estimating an amount of damages, and the court is unable, upon the few facts presented, to exercise its own judgment to

award a fair and reasonable damages figure for lost profits due to the breach.

The court's best judgment is that zero damages were proved by the evidence presented at trial and offered through stipulation of the parties.

III. Conclusions of Law

 Proof of but-for-the-breach investments is an essential element for the proof of lost profits in a *Winstar*-related case. *See Com Fed*, 59 Fed.Cl. at 344 (awarding lost profits damages on "[p]laintiff's fundamental claim ... that such breach caused them to for[e]go investment opportunities"). Because plaintiff has not proved that Columbia would have invested more in the but-for world, the court concludes as a matter of law that plaintiff is not entitled to lost profits damages.

Proof of the profitability of foregone investments is an essential element of lost profits damages in the *Winstar* context. *See Cal Fed I*, 245 F.3d at 1349 ("Lost profits are 'a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established ....'" (quoting *Neely v. United States*, 152 Ct.Cl. at 146, 285 F.2d 438)). Because plaintiff has not proved that its alleged incremental assets portfolio would have been profitable, the court concludes as a matter of law that plaintiff is not entitled to lost profits damages.

Proof of substantial factor causation is required to prove lost profits damages in the Winstar context, *see, e.g., Bluebonnet*, 266 F.3d at 1356 ("The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs ...."), and one element of substantial factor causation in the contract context is the existence of "a direct causal relationship,"*see Point Productions*, 215 F.Supp.2d at 344. Plaintiff has not proved that the phase-out of Family supervisory goodwill directly caused the lost profits damages claimed. Another element of substantial factor causation in the contract context is proof that the breach was the primary or predominating factor "bringing about the harm." *See Krauss v. Green-*

*barg*, 137 F.2d at 572. Because plaintiff did not prove that the breach was the primary factor in the alleged harm to Columbia, the court concludes as a matter of law that plaintiff is not entitled to lost profits damages.

The standard for foreseeability of lost profits in this court is that "'the injury ... follows the breach in the usual course of events.'" *Chain Belt*, 127 Ct.Cl. at 59, 115 F.Supp. 701 (citation omitted). Because plaintiff did not prove that its alleged foregone investments were in the usual course of events and thus foreseeable, the court concludes as a matter of law that plaintiff is not entitled to lost profits damages from those alleged foregone investments.

Evidence of lost profits must be "'"sufficient to enable a court or jury to make a fair and reasonable approximation [of damages]."'" *Bluebonnet*, 266 F.3d at 1355 (citations omitted). Because plaintiff failed to adduce sufficient evidence to estimate lost profits damages with reasonable certainty, the court concludes as a matter of law that plaintiff is not entitled to lost profits damages.

The standard for reasonable certainty of damages in the *Winstar* context requires that the damages model and its estimates be "grounded in the actual performance of the bank ...." *See Com Fed*, 59 Fed.Cl. at 351. Because plaintiff's damages model relies on assumptions and calculations not rooted in Columbia's actual performance in the real world, the court concludes as a matter of law that plaintiff is not entitled to lost profits damages.

Credibility determinations are an integral part of determining reasonably certain damages in a *Winstar*-related case. *See Cal Fed I*, 245 F.3d at 1350 (approving lower court's discounting of plaintiff's experts' "testimony that the cost of replacing $390 million of goodwill was nearly a billion dollars" for reasons of credibility, and affirming award based on defendant's estimate). Because plaintiff's damages model produced an estimate of damages that was not credible, the court concludes as a matter of law that plaintiff has not proved reasonably certain dam-

ages and is not entitled to lost profits damages.

The jury verdict method for awarding damages requires clear proof of injury, justification of plaintiff's inabilities to substantiate the amount of its lost profits damages, and sufficiency of the evidence for a fair and reasonable approximation of damages. *Dawco*, 930 F.2d at 880–81. Plaintiff did not show clear proof of injury. Plaintiff did not justify its inability to substantiate lost profits damages and thus did not show that there is no more reliable method of calculating damages. Plaintiff's evidence was not sufficient to allow a fair and reasonable approximation of damages. The court " 'occupies the position of a jury' " when contemplating an award of damages through the jury verdict method and must use its own " 'best judgment.' " *Bluebonnet*, 266 F.3d at 1357 (citations omitted). Plaintiff, in the court's best judgment, has proved zero damages. The court concludes as a matter of law that plaintiff cannot recover damages based on the jury verdict method.

## IV. Conclusion [36]

For the foregoing reasons, the court GRANTS Defendant's Motion for Judgment Upon Partial Findings and directs the Clerk to enter judgment for defendant. No costs.

IT IS SO ORDERED.

---

[36]. The court believes that analysis of any potential set-off to plaintiff's damages based on mitigating actions taken by plaintiff in response to the breach is unnecessary, in light of the foregoing findings of fact and conclusions of law.